FILED
05/28/2020
Clerk of the
Appellate Courts

# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
July 9, 2019 Session

## CYNTHIA E. YEBUAH ET AL. v. CENTER FOR UROLOGICAL TREATMENT, PLC

**Appeal from the Circuit Court for Davidson County**
**No. 14C4972          Joseph P. Binkley, Jr., Judge**

———————————————————

### No. M2018-01652-COA-R3-CV

———————————————————

Following surgery to remove a cancerous kidney, part of a gelport device was left inside the patient.  The patient and her husband brought this health care liability action against multiple defendants, including the surgeon who removed the kidney and the radiologist who initially failed to detect the foreign object.  The defendants admitted fault, so the trial focused solely on causation and damages.  The jury returned a verdict in favor of the plaintiffs and awarded $4 million in noneconomic damages to the patient for pain and suffering and loss of enjoyment of life and $500,000 in noneconomic damages to her husband for loss of consortium.  The trial court initially applied the statutory cap on noneconomic damages to the total damages award and entered a judgment of $750,000 in favor of both plaintiffs.  In response to the plaintiffs' motion to alter or amend, the trial court issued a revised judgment of $750,000 in favor of the patient and $500,000 in favor of the husband.  But the court refused to address the plaintiffs' arguments premised on the constitutionality of the statutory cap, ruling that the issue had been waived.  The court also denied the defendant's motion for a new trial or for a remittitur.  Upon review, we conclude that the trial court erred in refusing to consider the plaintiffs' constitutional issue.  But because we also conclude that the statutory cap on noneconomic damages is constitutional and was applied properly and that the defendant is not entitled to a new trial or a remittitur, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which RICHARD H. DINKINS, J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Randall L. Kinnard, Mary Ellen Morris, Jessica J. Kinnard, and Donald Capparella, Nashville, Tennessee, and John Vail, Washington, DC, for the appellants, Cynthia E. Yebuah and Eric N. Yebuah.

Marty R. Phillips, Dale Conder, Jr., and Craig P. Sanders, Jackson, Tennessee, and Wendy L. Longmire and T. William A. Caldwell, Nashville, Tennessee, for the appellee, Center for Urological Treatment, PLC.

Herbert H. Slatery III, Attorney General and Reporter, Andrée Sophia Blumstein, Solicitor General, and Joseph P. Ahillen, Assistant Attorney General, for the appellee, State of Tennessee.

Cary Silverman and Phil Goldberg, Washington, DC, and W. Morris Kizer, Knoxville, Tennessee, for amici curiae, Tennessee Medical Association, American Medical Association, Tennessee Chamber of Commerce and Industry, Chamber of Commerce of the United States of America, American Tort Reform Association, and Coalition for Litigation Justice, Inc.

Luke A. Wake, Washington, DC, and Braden H. Boucek, Nashville, Tennessee, for amici curiae, The Beacon Center of Tennessee and the National Federation of Independent Business Small Business Legal Center.

## OPINION

### I.

### A.

A CT scan revealed a mass on Cynthia Yebuah's left kidney. Her physician referred her to Dr. Frank Lohrasbi, a urologist, for further evaluation. Because there was a high likelihood that the mass was malignant, Dr. Lohrasbi recommended surgery to remove the affected kidney. Mrs. Yebuah agreed. And on March 4, 2005, Dr. Lohrasbi removed her left kidney using a laparoscopic technique. Mrs. Yebuah's recovery from surgery was uneventful.

To guard against the recurrence of cancer, Dr. Lohrasbi recommended a series of CT scans and ultrasounds. Mrs. Yebuah had her first CT scan four months after surgery. On July 6, 2005, Dr. Edward Priest, the radiologist who interpreted the scan, reported no signs of cancer. Dr. Lohrasbi reviewed his report and informed Ms. Yebuah of the good news.

Six months later, on February 10, 2006, Mrs. Yebuah had another CT scan. Again, she was cancer free. But this radiology report also noted a "tubular structure" within her abdominal cavity. Dr. Lohrasbi reviewed the report for signs of cancer but did not read the reference to the foreign object. So again he informed his patient that she had

2

no signs of cancer. This scenario was repeated with Mrs. Yebuah's next CT scan on February 8, 2007.

Fast forward to 2012. After complaining of severe abdominal pain, Mrs. Yebuah was referred to Dr. Leonardo Espinel for evaluation of suspected gallbladder disease. Dr. Espinel agreed that Mrs. Yebuah exhibited signs of an acute gallbladder attack. He recommended a gallbladder removal, but Mrs. Yebuah declined, hoping lifestyle changes would alleviate her symptoms.

But Mrs. Yehuah's lifestyle changes proved ineffective. On July 31, 2013, Dr. Espinel removed Mrs. Yebuah's gallbladder in another laparoscopic procedure. During the gallbladder surgery, Dr. Espinel discovered a white cylindrical object inside Mrs. Yebuah's abdominal cavity. Her small bowel was looped around the object and multiple adhesions had formed. Dr. Espinel also noted some chronic inflammation around the object.

After the surgery, Dr. Espinel told Mrs. Yebuah what he had seen. And he ordered another CT scan. The CT scan showed a 14-centimeter ring inside Mrs. Yebuah's abdomen, but no bowel obstruction. Dr. Espinel suspected that the ring had been left inside Mrs. Yebuah during her kidney surgery in 2005. So he also informed Dr. Lohrasbi.

Shocked by the discovery, Mrs. Yebuah and her husband, Eric Yebuah, met with Dr. Lohrasbi in early August to discuss the situation. Dr. Lohrasbi told the couple that he believed the ring was part of a gelport device used during her previous surgery. Unbeknownst to him, part of the device had separated during the procedure. Luckily, the ring was made of an inert material and appeared not to have caused Mrs. Yebuah any problems. In his medical opinion, Mrs. Yebuah could safely leave the ring in place.

But after consultation with another urologist, Mrs. Yebuah chose to have Dr. Espinel remove the ring. In November 2013, Mrs. Yebuah underwent yet another surgery. During this surgery, Dr. Espinal noticed an increased amount of inflammation, but still no bowel obstruction. Safely removing the multiple adhesions around the ring turned out to be a tedious and time-consuming process. He ultimately removed the ring in pieces. Mrs. Yebuah tolerated the procedure well and returned to work in just a few days.

B.

The Yebuahs filed this healthcare liability action against Dr. Lohrasbi and Dr. Priest and their respective employers, the Center for Urological Treatment, PLC (the

"Center") and Radiology Alliance, P.C.[1]  Among other things, the complaint alleged that Dr. Lohrasbi was negligent in leaving the ring in Mrs. Yebuah's abdomen after kidney surgery and in not removing the ring after it was noted on her subsequent CT scans.  The complaint also alleged that Dr. Priest was negligent in failing to mention the ring in the initial radiology report.  The Yebuahs eventually dismissed the doctors, electing to pursue vicarious liability claims against their employers.

In early 2018, the Yebuahs moved to amend their complaint.  Among other things, the proposed amended complaint alleged for the first time that the statutory cap on noneconomic damages in Tennessee Code Annotated § 29-39-102(a)(2) was unconstitutional.  The Center and Radiology Alliance opposed the motion to amend, arguing that the motion was untimely as it was only one month before trial.  They also objected to including a constitutional challenge in the complaint, particularly when the jury was precluded from knowing about the existence of the statutory cap.  *See* Tenn. Code Ann. § 29-39-102(g) (2012).

The Yebuahs served a copy of the proposed amended complaint on the Tennessee Attorney General as notice of their constitutional challenge.  *See* Tenn. R. Civ. P. 24.04.  The Attorney General notified the court that he was aware of the Yebuahs' constitutional challenge.  But he would not move to intervene unless the jury rendered a verdict in excess of the statutory cap.

At the pretrial conference, the Yebuahs' counsel announced that he would submit a new proposed amended complaint without the constitutional challenge.  With the court's permission, an amended complaint was filed shortly before trial.

Both the Center and Radiology Alliance admitted fault.  So the trial focused solely on causation and damages.  At the conclusion of the proof, the court directed a verdict in favor of Radiology Alliance.  But the case against the Center went to the jury.  The jury returned a verdict in favor of the Yebuahs.  And they awarded $4 million in noneconomic damages to Mrs. Yebuah for pain and suffering and loss of enjoyment of life and $500,000 in noneconomic damages to Mr. Yebuah for loss of consortium.

The Yebuahs' proposed judgment order did not reduce the jury's award of noneconomic damages as required by Tennessee Code Annotated § 29-39-102(a)(2).  Rather, they proposed entering a total judgment of $4.5 million.  The Center submitted a competing order that applied the statutory cap and reduced the damage award to $750,000.

---

[1] The initial complaint also named other defendants, but they are not pertinent to this appeal.

4

After notifying the Attorney General that the jury's verdict had exceeded the statutory cap,[2] the Yebuahs asked the court for a hearing on the language of the final judgment. They contended a hearing was necessary to resolve the pending constitutional issue. The Center objected and urged the court to apply the statutory cap. According to the Center, "the plaintiffs can raise all arguments against the constitutionality of the noneconomic limits once an order of judgment has been entered."

Rather than granting a hearing, the court adopted the Center's proposed order without comment and entered a judgment in favor of the Yebuahs in the amount of $750,000. The Yebuahs moved to alter or amend the judgment. They argued that the statutory cap was unconstitutional, and even if the statute passed constitutional muster, the court had applied the cap incorrectly. Meanwhile, the Center moved for a new trial or a remittitur contending that the damages awarded were excessive and multiple errors during trial affected the verdict.

Satisfied with the verdict, the court declined to order a new trial or suggest a remittitur. It granted the Yebuahs' motion to amend in part. The court applied the statutory cap separately to each plaintiff's award and entered a judgment of $750,000 in favor of Mrs. Yebuah and a judgment of $500,000 in favor of Mr. Yebuah. But the court agreed with the Center that the Yebuahs had waived their constitutional challenge. So the court declined to consider the constitutionality of the statutory cap.

## II.

Both the Yebuahs and the Center raise issues on appeal. We begin by considering whether the trial court properly determined that the Yebuahs had waived their challenge to the constitutionality of the statutory cap, a decision which was made in the context of a motion to alter or amend.

### A.

We review a trial court's decision on a motion to alter or amend for an abuse of discretion. *Harmon v. Hickman Cmty. Healthcare Servs., Inc.*, 594 S.W.3d 297, 305 (Tenn. 2020). A court abuses its discretion when it applies the wrong legal standard, reaches an illogical or unreasonable decision, or bases its decision on a clearly erroneous assessment of the evidence. *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). Our review of a discretionary decision is limited to determining whether the trial court's decision had the necessary factual support, whether the court identified and applied the correct law, and whether the court's decision was "within the range of acceptable alternative dispositions." *Id.*

---

[2] The court granted the Attorney General permission to intervene to defend the constitutionality of the statutory cap.

5

A Rule 59.04 motion "provide[s] the trial court with an opportunity to correct errors before the judgment becomes final." *In re M.L.D.*, 182 S.W.3d 890, 895 (Tenn. Ct. App. 2005). A motion to alter or amend may be granted "(1) when the controlling law changes before a judgment becomes final, (2) when previously unavailable evidence becomes available, or (3) when, for [unique] reasons, a judgment should be amended to correct a clear error of law or to prevent injustice." *Bradley v. McLeod*, 984 S.W.2d 929, 933 (Tenn. Ct. App. 1998), *rev'd on other grounds*, *Harris v. Chern*, 33 S.W.3d 741, 742 (Tenn. 2000).

The Yebuahs premised their Rule 59.04 motion on what they viewed as two clear errors of law. At this juncture, we focus on the court's treatment of their first ground— the failure to address their constitutional challenge before entering judgment. A motion to alter or amend is an appropriate vehicle for drawing the court's attention to matters that were overlooked. *See Chadwell v. Knox Cty.*, 980 S.W.2d 378, 383 (Tenn. Ct. App. 1998). Rule 59.04 "afford[s] litigants a limited opportunity to readdress previously determined issues and afford[s] trial courts an opportunity to revisit and reverse their own decisions." *Harris*, 33 S.W.3d at 744.

But the trial court ruled that the Yebuahs had waived their constitutional challenge. "[T]he importance of correctly resolving constitutional issues suggests that constitutional issues should rarely be foreclosed by procedural technicalities." *Richardson v. Tenn. Bd. of Dentistry*, 913 S.W.2d 446, 457 (Tenn. 1995). Still, a challenge to the constitutionality of a statute can be waived. *Ellithorpe v. Weismark*, 479 S.W.3d 818, 830 (Tenn. 2015). And "there is little difference between an issue improperly raised before the trial court at the last minute and one that was not raised at all." *In re Adoption of E.N.R.*, 42 S.W.3d 26, 32 (Tenn. 2001).

We review the trial court's waiver ruling as a mixed question of law and fact. *See, e.g.*, *State v. Hester*, 324 S.W.3d 1, 29-30 (Tenn. 2010) (waiver of right to counsel); *Charleston, S.C. Mining & Mfg. Co. v. Am. Agr. Chem. Co.*, 150 S.W.1143, 1146 (Tenn. 1911) (waiver of rights under a lease); *Culbertson v. Culbertson*, 455 S.W.3d 107, 125 (Tenn. Ct. App. 2014) (waiver of a privilege). So "a presumption of correctness attaches to the trial court's findings of fact," but "we are not bound by the trial court's determination of the legal effect of its factual findings." *Starr v. Hill*, 353 S.W.3d 478, 481-82 (Tenn. 2011). The facts on which the waiver is based must be supported by a preponderance of the evidence. *Culbertson*, 455 S.W.3d at 125. Whether the facts as supported by a preponderance of the evidence constitute a waiver is a question of law, subject to de novo review. *Id.*

Here, the trial court's waiver ruling was based on a factual finding that the Yebuahs did not raise their constitutional issue "before or during trial" but raised it "for the first time during a Rule 59 motion." We find that the evidence preponderates against

6

these findings. *See Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005). Before trial, the Yebuahs raised their constitutional challenge in a proposed amended complaint, which they also served on the Attorney General.[3] True, the Yebuahs did not raise the issue again until after the jury rendered its verdict. But arguments or evidence relating to the constitutionality of the statutory cap during trial were precluded. *See* Tenn. Code Ann. § 29-39-102(g) (prohibiting disclosure of the existence of the statutory cap to the jury). After the jury rendered its verdict, the Yebuahs again notified the Attorney General. And before the court entered a judgment, they requested a hearing on their constitutional challenge.

The Yebuahs' efforts to raise their constitutional issue distinguish this case from *In re Adoption of E.N.R.* and *In re Adrianna S.*, the cases relied on by the trial court. *See In re Adoption of E.N.R.*, 42 S.W.3d at 32; *In re Adrianna S.*, 520 S.W.3d 548, 561 (Tenn. Ct. App. 2016). In *In re Adoption of E.N.R.*, the defendant never raised the constitutional issue in a pleading or motion. And after carefully reviewing the record, the supreme court concluded that the defendant "raised no constitutional challenge whatsoever until closing argument." 42 S.W.3d at 28-29. In *In re Adrianna S.*, the first indication that the defendant challenged the constitutionality of the parental termination statute appeared in a post-trial brief. 520 S.W.3d at 554. By contrast, Mr. and Mrs. Yebuah tried, albeit unsuccessfully, to raise their constitutional issue earlier.

We conclude that the court erred in refusing to consider the Yebuahs' constitutional challenge to the statutory cap. The Yebuahs did not raise this issue for the first time in their motion to alter or amend. They raised the issue before trial. They raised it again after the verdict. When the court entered judgment without addressing their constitutional challenge, they availed themselves of the opportunity afforded by Rule 59.04 to remind the court of an important issue that had been overlooked.

The Center suggests that we should remand this case for the trial court to consider the Yebuahs' constitutional challenge. *See Nunn v. Tenn. Dep't of Corr.*, 547 S.W.3d 163, 190 (Tenn. Ct. App. 2017). As a court of appellate jurisdiction, we consider those issues that were presented to the trial court and decided or pretermitted. *See* Tenn. Code Ann. § 16-4-108(a)(1) (2009); *Clement v. Nichols*, 209 S.W.2d 23, 23 (Tenn. 1948).

---

[3] We are unpersuaded by the Center's argument that the Yebuahs affirmatively waived their constitutional issue by removing the constitutional challenge from the amended complaint. Waiver is the voluntary relinquishment of a known right. *Chattem, Inc. v. Provident Life & Accident Ins. Co.*, 676 S.W.2d 953, 955 (Tenn. 1984). It is clear from this record that the Yebuahs did not remove the constitutional allegations because they had abandoned this claim. Rather, they acquiesced to the Center's demand that the constitutional allegations be removed because they agreed that the jury should not be informed of the existence of the cap and the allegations had served their purpose of informing all parties of their intent to challenge the constitutionality of the statute if the damages awarded exceeded the statutory cap.

7

But our supreme court's recent decision in *McClay v. Airport Management Services, LLC*, resolves the majority of the Yebuahs' constitutional claims. 596 S.W.3d 686, 696 (Tenn. 2020). And neither party has suggested what additional evidence, if any, would be necessary to resolve a facial challenge to the validity of the statute.[4] *Cf. Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983). Under these unique circumstances, remand to the trial court for the sole purpose of addressing the plaintiffs' constitutional issue would be a waste of judicial resources. In the interests of judicial economy, we will address the Yebuahs' arguments that the statutory cap is unconstitutional.

B.

Compensation for noneconomic damages in civil actions is capped at $750,000 for each injured plaintiff "for all injuries and occurrences that were or could have been asserted, regardless of whether the action is based on a single act or omission or a series of acts or omissions that allegedly caused the injuries or death." Tenn. Code Ann. § 29-39-102(a)(2). For plaintiffs who experience a "catastrophic loss or injury," the cap increases to $1,000,000. *Id.* § 29-39-102(c)-(d). The trial court applies the cap after the jury has assessed damages. *Id.* § 29-39-102(g). Some exclusions do apply. *See id.* § 29-39-102(h), (l). But none of the statutory exemptions are relevant here.

The Yebuahs cite multiple provisions of the Tennessee Constitution in their quest to invalidate the statutory cap on noneconomic damages. In their words,

> (a) it violates the right to trial by jury in Article 1, section 6 of the Tennessee Constitution, which requires that the right to trial by jury shall be held "inviolate," (b) it violates the separation of powers and the right to petition for redress of grievances, (c) it disproportionately burdens women, the elderly, and children, and (d) it violates the takings and equal protection doctrines, and the Plaintiffs' rights to due process.

A facial challenge is "the most difficult [constitutional] challenge to mount successfully." *See Waters v. Farr*, 291 S.W.3d 873, 921 (Tenn. 2009) (Koch, J., concurring in part and dissenting in part). All statutes are presumed to be constitutional. *In re Burson*, 909 S.W.2d 768, 775 (Tenn. 1995). This presumption "applies with even greater force" to a facial challenge. *Gallaher v. Elam*, 104 S.W.3d 455, 459 (Tenn. 2003). To successfully challenge the facial validity of a statute, "the challenger must demonstrate that the law cannot be constitutionally applied to anyone." *Waters*, 291 S.W.3d at 921-22 (Koch, J., concurring in part and dissenting in part).

---

[4] In their reply brief, the Yebuahs state no evidence is necessary and argue that we may decide their facial challenge to the constitutionality of the statutory cap.

At the outset, we note that the Yebuahs failed to construct an argument in support of their due process claim. And the right to petition for redress of grievances received only scant attention and even then only in conjunction with their separation of powers argument. *See* Tenn. R. App. P. 27(a)(7). These failings are more than procedural technicalities. Our role is not "to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Sneed v. Bd. of Prof'l Responsibility*, 301 S.W.3d 603, 615 (Tenn. 2010). So we deem the due process and right to petition claims waived.

The bulk of the Yebuahs' argument is devoted to their claims that the statutory cap violates the right to trial by jury and the doctrine of separation of powers and has a disproportionate impact on women in violation of the equal protection clause. *See* Tenn. Const. art. I, sec. 6 (trial by jury); *id.* art. II, sec. 1, 2 (establishing the legislative and judicial branches of government); *id.* art. I, sec. 8 and art. XI, sec. 8 (equal protection guarantee). While this appeal was pending, our supreme court ruled, as a matter of law, "that the statutory cap on noneconomic damages in Tennessee Code Annotated section 29-39-102 does not violate the right to trial by jury, the doctrine of separation of powers, or the equal protection provisions of the Tennessee Constitution." *McClay*, 596 S.W.3d at 696. We are bound by that decision.

One last constitutional argument requires our attention. The Yebuahs contend that the statutory cap diminishes the value of a plaintiff's cause of action "without sufficient public purpose, and without compensation, in violation of the takings doctrine." Like its federal counterpart, our state constitution precludes the government from taking private property without just compensation. Tenn. Const. art. I, § 21. This constitutional prohibition applies with equal force to "every type of property." *Zirkle v. City of Kingston*, 396 S.W.2d 356, 361 (Tenn. 1965). "[A] vested right of action is as much property as are tangible things." *Morris v. Gross*, 572 S.W.2d 902, 905 (Tenn. 1978).

But a property interest in a cause of action cannot vest until the cause of action has accrued. *Mills v. Wong*, 155 S.W.3d 916, 921 (Tenn. 2005). And the statutory cap only applies prospectively to causes of action that accrued on or after the effective date of the statute.[5] *McClay*, 596 S.W.3d at 689. Thus, it does not diminish any vested property rights. Besides, it is well-settled in Tennessee that "no one has a vested right in a particular remedy." *Morris*, 572 S.W.2d at 905.

---

[5] Mrs. Yebuah's cause of action accrued in July 2013 when she discovered her injury. *See Sherrill v. Souder*, 325 S.W.3d 584, 595 (Tenn. 2010).

9

C.

The Center argues that the trial court erred in amending its original judgment to apply the statutory cap separately to each plaintiff's award. The Center contends the legislature intended for the cap to be applied to the total award of noneconomic damages. In other words, the court should have aggregated the noneconomic damages awarded to each plaintiff and then reduced the total award to $750,000. The answer to this dispute lies in the language of the statute. *See* Tenn. Code Ann. § 29-39-102. Statutory interpretation is a question of law, which we review de novo, with no presumption of correctness. *Davis ex rel. Davis v. Ibach*, 465 S.W.3d 570, 573 (Tenn. 2015).

Our goal in statutory interpretation is to "ascertain and effectuate the legislature's intent." *Kite v. Kite*, 22 S.W.3d 803, 805 (Tenn. 1997). When a statute's language is unambiguous, we derive legislative intent from the statute's plain language. *Carson Creek Vacation Resorts, Inc. v. Dep't of Revenue*, 865 S.W.2d 1, 2 (Tenn. 1993). The words used in the statute should be given their natural, ordinary meaning "in the context in which they appear in the statute and in light of the statute's general purpose." *Lee Med., Inc.*, 312 S.W.3d at 526. But, when a statute's language is subject to several interpretations, we also consider the broader statutory scheme, the statute's general purpose, and other sources to ascertain legislative intent. *Wachovia Bank of N.C., N.A. v. Johnson*, 26 S.W.3d 621, 624 (Tenn. Ct. App. 2000).

Here, our focus is on two subsections of the statute. The subsections provide:

(a) In a civil action, **each injured plaintiff** may be awarded:

(1) Compensation for economic damages suffered **by each injured plaintiff**; and
(2) Compensation for any noneconomic damages suffered **by each injured plaintiff** not to exceed seven hundred fifty thousand dollars ($750,000) for all injuries and occurrences that were or could have been asserted, regardless of whether the action is based on a single act or omission or a series of acts or omissions that allegedly caused the injuries or death.

. . . .

(e) All noneconomic damages awarded **to each injured plaintiff**, including damages for pain and suffering, as well as any claims of a spouse or children for loss of consortium or any derivative claim for noneconomic damages, shall not exceed in the aggregate a total of seven hundred fifty thousand dollars ($750,000), unless subsection (c) applies, in which case the aggregate amount shall not exceed one million dollars ($1,000,000).

10

Tenn. Code Ann. § 29-39-102(a), (e) (emphasis added).

The repeated phrase "each injured plaintiff" tells us that the legislature chose to impose a "per plaintiff" limit on noneconomic damages. There were other possibilities available, such as a limit on the total damages recoverable in each action. *See, e.g.*, Mich. Comp. Laws Ann. § 600.2946a (West, Westlaw through P.A.2020, No. 84, of the 2020 Reg. Sess., 100th Legis.) ("In an action for product liability, the total amount of damages for noneconomic loss shall not exceed $280,000.00."); Va. Code Ann. § 8.01-581.15 (West, Westlaw through the End of 2019 Reg. Sess.) ("In any verdict returned against a health care provider in an action for malpractice . . ., the total amount recoverable for any injury to, or death of, a patient shall not exceed . . . ."). Given the legislature's choice to impose a "per plaintiff" cap, we conclude that, when there are two injured plaintiffs, the cap should be applied separately to the noneconomic damages awarded to each injured plaintiff.

Implicit in the Center's argument is the view that plaintiffs raising solely loss of consortium claims should be afforded less than full plaintiff status. But in Tennessee a "loss of consortium claim is a distinct cause of action vested solely in the spouse." *Hunley v. Silver Furniture Mfg. Co.*, 38 S.W.3d 555, 557 (Tenn. 2001); *accord Jackson v. Miller*, 776 S.W.2d 115, 117 (Tenn. Ct. App. 1989). "[T]he right to recover for loss of consortium is . . . independent of the spouse's right to recover for the[ir own] injuries." *Swafford v. City of Chattanooga*, 743 S.W.2d 174, 178 (Tenn. Ct. App. 1987). And our supreme court has previously rejected the argument that "consortium" plaintiffs are not entitled to be treated as "party plaintiffs." *See Tuggle v. Allright Parking Sys., Inc.*, 922 S.W.2d 105, 107 (Tenn. 1996).

Even so, the Center argues that applying a separate cap to damages awarded for loss of consortium ignores subsection (e). We disagree. A familiar canon of statutory interpretation requires us to give effect "to every clause and part of the statute, thus producing a consistent and harmonious whole." *Finley v. Keisling Lumber Co.*, 35 S.W.2d 388, 388 (Tenn. 1931). The text of subsection (e) reinforces our conclusion that the statutory cap is a "per plaintiff" cap. *See* Tenn. Code Ann. § 29-39-102(e) ("All economic damages awarded to each injured plaintiff . . . ."). And it tells us that "each injured plaintiff" is subject to the statutory cap. Subsection (e) addresses the all-too-common scenario in which an injured plaintiff suffers more than one type of noneconomic damage. When one injured plaintiff seeks compensation for both personal injuries and loss of consortium, subsection (e) limits that plaintiff to one award of noneconomic damages for all injuries not to exceed $750,000.

11

D.

1. Conduct of Trial

Now we turn to the Center's request for a new trial or a remittitur. The Center argues that multiple errors at trial affected the verdict and necessitate a new trial.[6] "Trial judges have broad discretion in controlling the course and conduct of a trial." *Meals ex rel. Meals v. Ford Motor Co.*, 417 S.W.3d 414, 420 n.7 (Tenn. 2013). So we apply the deferential abuse of discretion standard of review to the trial court's decisions on matters such as the admission or exclusion of evidence, the examination of witnesses, and the conduct of closing argument. *See White v. Beeks*, 469 S.W.3d 517, 527 (Tenn. 2015), *as revised on denial of reh'g* (Aug. 26, 2015); *Elliott v. Cobb*, 320 S.W.3d 246, 249 (Tenn. 2010); *Coffee v. State*, 216 S.W.2d 702, 703 (Tenn. 1948).

The Center's first complaint is that the Yebuahs improperly elicited standard of care testimony from Dr. Lohrasbi in violation of a previously-granted motion in limine. Because the Center failed to make a timely objection to this testimony during trial, we deem this issue waived. *See* Tenn. R. App. P. 36(a); *Grandstaff v. Hawks*, 36 S.W.3d 482, 488 (Tenn. Ct. App. 2000) ("A party who invites or waives error, or who fails to take reasonable steps to cure an error, is not entitled to relief on appeal.").

a. Opening the Door

Next, the Center contends that the trial court erred in excluding evidence that the gelport device may have malfunctioned because the Yebuahs' questioning of Dr. Lohrasbi "opened the door." "A party opens the door to evidence when that party 'introduces evidence or takes some action that makes admissible evidence that would have previously been inadmissible.'" *State v. Vance*, 596 S.W.3d 229, 249 (Tenn. 2020) (quoting 21 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE EVIDENCE § 5039 (2d ed. 1987)). Evidence that the gelport device may have malfunctioned was inadmissible at trial as a blame-shifting device because the Center did not raise the comparative fault of the product manufacturer as an affirmative defense. *See George v. Alexander*, 931 S.W.2d 517, 522 (Tenn. 1996). So the only way this inadmissible evidence became admissible is if the plaintiffs opened the door.

The Center relies on the following exchange between the Yebuahs' counsel and Dr. Lohrasbi:

---

[6] We decline the Center's invitation to apply the cumulative error doctrine. *See In re Kaycee M.*, No. M2017-02160-COA-R3-PT, 2018 WL 4778018, at *8 n.8 (Tenn. Ct. App. Oct. 3, 2018) and *In re Abbigail C.*, No. E2015-00964-COA-R3-PT, 2015 WL 6164956, at *25 (Tenn. Ct. App. Oct. 21, 2015) (both declining to apply the cumulative error doctrine in a civil action).

12

Q. And so I'm sure you wanted to do investigation in order to give good medical advice to the Yebuahs. Is that fair?

A. Yes.

Q: Did you, in the meantime, call the manufacturer of the ring and ask them, "What is this thing made of? How many layers are there in it? And what would happen if it was left in a patient for eight years and it wasn't supposed to be in there?" Did you call the manufacturer?

A. I remember having a discussion with our local representative.

Q. What did that person tell you?

A. They did not give me an opinion, as I – as far as I can remember.

The most common way to open the door to otherwise inadmissible evidence is to raise the subject at trial. *Vance*, 596 S.W.3d at 250. But more than mere relevance is necessary before the door to inadmissible evidence is opened. *Id.* "[O]pening the door is a doctrine intended to serve fairness and truth-seeking." *Id.* The door opens when the party who raised the subject gains a misleading advantage from introducing the initial evidence. *Id.*; *see also Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 48 (Tenn. Ct. App. 2013) (explaining that unless the opposing party has been unfairly prejudiced by the introduction of the original evidence, the door has not been opened). And even then "the remedy . . . should be both relevant and proportional." *Vance*, 596 S.W.3d at 251. Responsive evidence should be limited to the evidence necessary to correct the misleading advantage or unfair prejudice created by the initial evidence. *Id.*

Not surprisingly, the trial court "is in the best position to gauge the prejudicial impact of particular testimony." *Id.* (citation omitted). Here, the trial court heard Dr. Lohrasbi's testimony and determined that the door had not been opened. We cannot say that the trial court abused its discretion. The Yebuahs' counsel asked Dr. Lohrasbi several questions about how he prepared for his meeting with the Yebuahs and how he came to the conclusion that it would be safe to leave the ring in place. No prejudice or confusion could reasonably have arisen from the mere mention of the product manufacturer.

b. Closing Argument

The final alleged error occurred during the Yebuahs' closing argument. The Center objected to counsel's references to Dr. Lohrasbi's conduct as "dangerous" and his appeals to the jury to "make it right." According to the Center, these comments shifted the jury's focus to punishment, rather than reasonable compensation.

13

Lawyers use closing argument "to present their theory of the case and to point out strengths and weaknesses in the evidence." *Stanfield v. Neblett*, 339 S.W.3d 22, 43 (Tenn. Ct. App. 2010); *see also Elliott*, 320 S.W.3d at 250 ("During arguments to the jury, counsel may argue their analysis of the evidence that has been presented at trial."). The Yebuahs' counsel reminded the jury that Dr. Lohrasbi had both admitted fault and agreed that failure to read a complete CT scan report was dangerous. There is "nothing wrong with reminding the jury in closing argument of the testimony of various witnesses." *Perkins v. Sadler*, 826 S.W.2d 439, 443 (Tenn. Ct. App. 1991). The Center had an equal opportunity to discuss the evidence and present its theory of the case.

Likewise, we do not view the request that the jury "make it right" as an unwarranted appeal to the jury's emotions. The jury was tasked with assessing damages. "The goal of awarding damages is to repair the wronged party's injury or, at least, to make the wronged party whole as nearly as may be done by an award of money." *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 703 (Tenn. Ct. App. 1999). In other words, juries in a negligence action can "make it right" by awarding reasonable compensation.

2. Excessive Damages

The jury awarded Mrs. Yebuah $2 million for pain and suffering and $2 million for loss of enjoyment of life. They also awarded Mr. Yebuah $500,000 for loss of consortium. Convinced that the jury award was excessive, the Center asked the trial court to suggest a remittitur or grant a new trial on damages. "As thirteenth juror, the trial judge must independently weigh and review the evidence presented at trial to determine whether it preponderates in favor of the verdict and decide whether he or she agrees with and is satisfied with the jury's verdict." *Meals ex rel. Meals*, 417 S.W.3d at 420. Here, the trial court was satisfied with the amount of the verdict.

Given the trial court's approval, our ability to grant the Center its requested relief is limited.[7] *See id.* at 422 (holding that "[w]here the trial judge has approved the verdict in its role as thirteenth juror . . . [appellate] review . . . is limited to a review of the record to determine whether the verdict is supported by material evidence"). We must take the strongest legitimate view of the evidence supporting the verdict, including all reasonable inferences, assume the truth of the supporting evidence, and discard all countervailing evidence. *Crabtree Masonry Co. v. C & R Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn. 1978). If there is any material evidence to support the verdict, we must affirm. *Id.* "Material evidence" is evidence "which must necessarily enter into the consideration of the controversy and by itself, or in connection with the other evidence, be determinative of the case." *Meals ex rel. Meals*, 417 S.W.3d at 422 (citation omitted).

---

[7] The Center asks this Court to order a new trial or to suggest a remittitur under $750,000.

A plaintiff is entitled to compensation for noneconomic losses. *Id.* at 420. Here, we are concerned with two types of noneconomic damages—pain and suffering and loss of enjoyment of life. Pain and suffering includes both physical and mental pain. *Overstreet*, 4 S.W.3d at 715. So a pain and suffering award may include compensation for the plaintiff's "anguish, distress, fear, humiliation, grief, shame, or worry." *Id.* Damages for loss of enjoyment of life, a "separate and distinct loss," seeks to compensate the plaintiff for the impact the defendant's conduct had on the plaintiff's ability to enjoy the normal pleasures of living. *Id.* at 715-16. "The policy underlying the award of loss of enjoyment damages is of making the victim whole in the only way a court can—with an equivalent in money for each loss suffered." *Id.* at 716.

"The assessment of non-economic damages is not an exact science, nor is there a precise mathematical formula to apply in determining the amount of damages an injured party has incurred." *Meals ex rel. Meals*, 417 S.W.3d at 420. These awards are "often highly subjective." *Dedmon v. Steelman*, 535 S.W.3d 431, 438 (Tenn. 2017). Because of the difficulty inherent in the task, jurors have "broad latitude in fixing the monetary amount of non-economic damages." *Id.* Courts "trust jurors to use their personal experiences and sensibilities to value the intangible harms." *Meals ex rel. Meals*, 417 S.W.3d at 425.

According to the Center, $4 million is an unreasonable and excessive award of damages for "a three-month period of minimal abdominal discomfort, a brief moment of anxiety, an outpatient laparoscopic surgery, and occasional, vaguely-described discomfort during sexual intercourse."[8] But the Center is viewing the evidence through the wrong lens. When we take the "strongest legitimate view of the evidence supporting the verdict," assume its truth and discard all countervailing evidence, a different picture emerges. *See Crabtree Masonry Co.*, 575 S.W.2d at 5.

Mrs. Yebuah was shocked and dismayed to learn that part of a medical device had been left inside her abdomen for eight years. A few months after the discovery, she made the difficult choice to have the device surgically removed. Another surgery came with its own set of risks. And this surgery required extreme caution to remove the ring without injury to Mrs. Yebuah.

Mrs. Yebuah and her husband also told the jury about the "prickly pain" she experienced for eight years. The pain was unpredictable, but it often occurred after eating. The pain made marital intimacy uncomfortable, leading to a significant loss of intimacy during those eight years. Dr. Black confirmed that Mrs. Yebuah's complaints were consistent with what he would expect given the location of the device in her abdomen.

---

[8] Both the Center and the Yebuahs address the reasonableness of the damages awarded before reduction by the statutory cap. Thus, we do not decide the impact of the statutory cap on our review.

The Center pointed out that Mrs. Yebuah's pain could have been caused by her gall bladder. And it emphasized to the jury that Mrs. Yebuah never told her physicians about her prickly pain or its detrimental effect on her marital relations. But the jury apparently believed the Yebuahs' explanation that Mrs. Yebuah was a stoic woman who only realized the full extent of her injury after the ring was removed.

The Yebuahs were entitled to substantial noneconomic damages based on the evidence presented. Still, the Center maintains that the jury's verdict exceeds the uppermost boundary of the range of reasonableness in comparison to other jury verdicts. We are mindful that "each case must be judged on its own particular facts." *Meals ex rel. Meals*, 417 S.W.3d at 426. And in comparing jury verdicts, "we must take care to only consider cases that are 'similar'—presumably involving a similar plaintiff with similar injuries" and take into account other factors such as inflation. *Id.* The Center cites jury verdicts from 2003, 2008, and 2009 as evidence that this 2018 verdict is excessive. The Center's cases are simply too far removed in time to yield a useful comparison. The amount awarded, while high, is within the range of reasonableness.

### III.

Because the trial court's waiver finding was based on a clearly erroneous assessment of the evidence, we conclude the court erred in refusing to consider the Yebuahs' constitutional challenge to the statutory cap on noneconomic damages. But the Yebuahs failed to establish that the statute is unconstitutional on its face. So the court did not err in applying the statutory cap. We further conclude that the court properly applied the cap separately to the noneconomic damages awarded to each injured plaintiff.

The damages awarded by the jury are supported by material evidence. And we discern no reversible error in the conduct of the trial. So we also affirm the court's denial of the motion for a new trial or remittitur.

_____
W. NEAL MCBRAYER, JUDGE

16